<partyblock>

Lantau Holdings Ltd., Plaintiff,

against

Orient Equal International Group Limited, WEIBIN HUANG, HUANG DONGPO, JAMES WANG (a/k/a, LING WANG), HAITONG INTERNATIONAL SECURITIES COMPANY LIMITED, LI WEN HAO, Defendants.

LANTAU HOLDINGS LTD., Plaintiff,

against

GENERAL PACIFIC GROUP LTD., SVK CAPITAL MANAGEMENT, LTD., JOHN DOES 1 THROUGH 30,Defendants.

653920/2016

Plaintiff Lantau Holdings Ltd. was represented by Michael J. Maloney, Esq., CKR Law, 1330 Avenue of the Americas, 14th Floor, New York, NY 10019 (212) 259-7300 mmaloney&commat;ckrlaw.com

Defendants Orient Equal International Group Limited, Weibin Huang, Huang Dongpo, Haitong International Securities Company Limited, Li Wen Hao (Index No. 653920/16) were represented by Laurence J. Lebowitz, Dealy Silberstein & Braverman, LLP, 225 Broadway, Suite 1405, New York, NY 10007 (212) 385-0066 llebowitz&commat;dsblaw.ny.com.

Defendants General Pacific Group Ltd., John Does 1 through 30 (Index No. 650085/17) were represented by Andrew W. Goldwater, Friedman Kaplan, 7 Times Square, New York, NY 10036-1199 agoldwater&commat;fklaw.com.

Barry Ostrager, J.

These related actions were consolidated for decision. The trial of Lantau Holdings Ltd. ("Lantau") v. General Pacific Group Ltd ("GPG") et al., Index No. 650085/2017, took place on October 22, 23, and 24, 2018. The trial of the Lantau v. Orient Equal International Group Ltd ("OEI"), et al., Index No, 653920/2016, took place on December 12, 13, and 14, 2018 and concluded on January 4, 2019. The last post-trial briefs were received on January 29, 2019. Additional letter submissions were made in response to Court notices through and including February 7, 2019.

At issue in both cases are the rights and obligations of the parties with respect to certain restricted shares of REX Global Holdings Ltd. ("REX"), originally owned by Huang Dongpo ("Dongpo") and Orient Equal International Group ("OEI"). Preliminarily, it is undisputed that Dongpo and OEI executed various documents with Lantau involving pledges of shares of REX to Lantau in exchange for loans, including stock purchase agreements ("SPAs"), which Dongpo and OEI breached by delivering restricted shares of REX. In these agreements Dongpo and OEI represented that the REX stock was unrestricted and that Lantau could sell the stock. It is also undisputed that the breach of the agreements constituted a default which triggered certain indemnification obligations and entitled Lantau to retain possession of the REX stock. It is equally undisputed that Lantau sold the stock to GPG pursuant to two SPAs dated May 16 and May 23, 2016 and that the SPAs included numerous representations and warranties from Lantau that the stock was unrestricted. A breach of the Lantau SPAs triggered certain indemnification obligations of Lantau to GPG.

In prior proceedings, the Appellate Division, First Department, in Lantau Holdings Ltd. v. General Pacific Group Ltd., 163 AD3d 407 (1st Dep't 2018) ("Lantau v. GPG") modified a prior decision of this Court on GPG's motion to dismiss in Lantau v. GPG and held that Lantau could pursue a breach of contract claim but not an unjust enrichment claim against GPG. The First Department held that GPG did not waive certain defenses to Lantau's breach of contract [*2]claims, stating specifically, "GPG did not waive its rights with respect to the restrictions on the stock, and clearly relied upon the representations and warranties issued by Lantau regarding the stock being unrestricted, at least in the first SPA." 163 AD3d at 410. GPG has also asserted counterclaims against Lantau for breach of contract.

In the OEI action, Lantau has asserted breach of contract and other claims against the OEI defendants. The defendants other than James Wang a/k/a Ling Wang ("Wang"), who defaulted, have asserted counterclaims alleging fraud by Lantau in connection with the original transactions. Significantly, and as discussed in detail infra, Lantau originally named SVK Capital Management, Ltd. ("SVK") a defendant in the Lantau v. GPG action, alleging, inter alia, that SVK breached its fiduciary and contractual duties as a custodial broker by failing to notify Lantau that the REX stock at issue in these cases was restricted. Lantau also asserted claims against SVK for gross negligence and unjust enrichment. It is undisputed that SVK has either received or claims delivery fees, custody fees, commissions and other fees totaling in excess of $2 million against Lantau and/or GPG. Lantau entered into a confidential settlement with SVK granting SVK a contingent interest in the disposition of any REX shares recovered by Lantau as well as other consideration. Ironically, the evidence adduced at these two trials established that SVK's conduct was the but for cause of all the damages sustained by all the parties in these two actions.

The Court heard testimony from nine witnesses in the two related trials and has made factual determinations based upon the credibility of the nine witnesses and the scores of documents received in evidence. A brief summary of the historical relationships among the parties is essential to the resolution of these cases.

Robert P. Marino ("Marino"), who testified extensively at both trials, is the sole managing director of Lantau. Lantau is a British Virgin Islands Company, but Mr. Marino lives in Westchester, New York. David Wong ("Wong") is the managing member and sole owner of GPG which he operates with the assistance of Howard Blum ("Blum"). GPG is in the business of engaging in share repurchase loan agreements which are referred to as repo transactions. GPG is also a British Virgin Islands Company, although both Wong and Blum reside in the United States. During the period relevant to these trials, GPG engaged in repo transactions by securing financing from "liquidity providers" who supplied GPG with the capital to engage in repo transactions in exchange for an agreed upon share of the profits GPG earns in connection with the repo transactions GPG either originated or participated in. One of the liquidity providers utilized by GPG was non-party Manuel Bello ("Bello"), who was a witness in the GPG trial. Another liquidity provider involved in these transactions is Harsh Padia.

It is undisputed that Marino first met Messrs. Blum and Bello in September 2014. At this meeting Blum and Bello explained GPG's business model and explored with Marino the possibility of establishing a working relationship. Marino had a follow up meeting with Blum and Bello in October 2014 that was also attended by Wong. Blum and Bello have previously been involved in questionable transactions and have been censured and fined by the U.S. Securities and Exchange Commission with respect to the public sale of restricted securities.

During the 2014 meetings Wong, Blum, and Bello described to Marino the GPG share repurchase loan business model, typical deal structures, the loan documents that GPG had used in prior deals, and other details of repo transactions. Marino was provided with an entire package of GPG's "loan bundle" which consisted of scores of single-spaced pages, including a loan agreement, a springing pledge agreement, various undertakings, promissory notes, and a [*3]control agreement. Bello subsequently introduced Marino to an attorney who helped Marino form Lantau. In 2015 Lantau participated in a highly profitable transaction with GPG involving shares of China Rongsheng Heavy Industries Group Holdings Ltd. ("Rongsheng"), but presently, Lantau has no assets other than its claims in these cases.[FN1]

GPG and Lantau agreed that Lantau would act as a stock loan lender and that Lantau would identify potential borrowers, obtain executed "loan bundles", and arrange to on-board the borrowers with a broker-dealer. Lantau, in turn, would involve GPG in these loan repurchase transactions. At some point prior to May 2016, Marino also met defendant Wang in New York to discuss potential stock loan transactions. Prior to the transactions at issue in these cases, Wang proposed several transactions to Marino, none of which came to fruition.

Lantau and GPG agreed that with respect to any loan Lantau originated, Lantau and GPG would negotiate SPAs for the purchase and sale of the shares that were to be delivered by the borrower in connection with the stock loan. Lantau and GPG would agree on terms of the Lantau SPA with the borrower and the Lantau SPA with GPG would exactly match the amounts to be disbursed to the borrower in connection with the stock loan. The SPAs would typically contemplate two payments to the borrower. The first payment was fixed by contract. The second payment was due several days later and was to be calculated based on the volume weighted average price ("VWAP") for an agreed upon period minus the first payment. The Lantau SPA with GPG would also provide for a third payment based on the amount of proceeds generated by GPG in excess of the sum of the first and second payments. The potential for profit
existed because the SPAs expressly provide that the stock pledged as security for the loan can be sold by the lender, subject to the lender's obligation to return the stock in the event the loan is fully repaid. Once the borrower had signed the necessary documents with Lantau and was ready to proceed, Lantau and GPG would execute an SPA before closing the loan.

Lantau expected to benefit from this business arrangement by receiving interest payments from its borrowers during the term of its loans. Lantau would further benefit from any third payment that might be owed under the SPAs with GPG. In theory, the Lantau originated loans were risk free from Lantau's perspective. GPG expected to benefit by selling the pledged shares for more than the sum of the first and second payments. This is exactly how the Rongsheng transaction was documented and executed to the mutual benefit of Lantau and GPG.

In return for providing liquidity to GPG to fund these transactions, Bellow, one of GPG's liquidity providers, received 80 percent of GPG's profits generated from the transactions, while GPG would receive 20 percent of the profits. Bello had the option of securing funding from other "liquidity providers." The Lantau-GPG business model, of course, was predicated upon finding borrowers who were unlikely to repay the stock loans and who were prepared to pledge stock at an attractive loan-to-value relationship.

Defendant OEI is a company formed by defendant Dongpo Huang ("Dongpo") for his [*4]son Weibin Huang. OEI conducted no business other than the transaction that is the subject of Lantau's claim against OEI. Defendant Weibin Huang resides in Beijing, China and has limited facility with the English language. Dongpo resides in Shenzhen, China and has no facility with the English language. Defendant L. Wien Hao ("Hao") is a personal financial consultant for one Zang Xiaomeng ("Zang").

In March 2016, REX Global Holdings Ltd. ("REX") issued a public announcement stating that Haitong International Securities Company Ltd. ("Haitong") would act as REX's placing agent concerning 25 billion newly issued and restricted REX shares. The testimony adduced at trial established that Marino read the public announcements by REX concerning the April 2016 placement, which was conditioned upon the placement being subscribed by more than six purchasers. REX's announcements also disclosed that because the REX shares offered in the placement were priced at an 84% discount to the then prevailing market price, the shares issued in the placement would be subject to a lock-up period of two years from the date of issue and allotment.

Zang had contacts with the issuer of the REX restricted stock and participated in the REX placement. While not relevant to any issue in this case, it appears that Zang, through other associates, lent Dongpo and OEI the money to purchase the REX shares. Zang apparently split up the restricted REX stock to which he had access in order to avoid a recording requirement of Hong Kong rules. Zang relied upon Hao to advise him on how to effectuate Zang's plan. In April 2016, OEI and Dongpo acquired 917 million REX shares as part of the 25 billion REX share offering, paying approximately HK $.031 per share with funds borrowed from Zang and/or Zang's associate, Chen. Dongpo and OEI signed "lock-up undertakings" with REX dated April 22, 2016. The lock-up undertakings provided that Dongpo and OEI could not "sell, offer to sell, contract or agree to sell, mortgage, charge, pledge . . . any of the placing shares or any interest therein" for two years. The shares OEI and Dongpo purchased were held in accounts created for OEI and Dongpo at Haitong subject to margin liens totaling $1.6 million. In April 2016, Haitong was aware of the identities of all of the owners of the restricted REX shares, including Dongpo and OEI.

Hao and defaulting defendant Wang knew about the lock-up restrictions at the time Wang commenced discussions with Lantau about a prospective stock loan by OEI and Dongpo. Wang's original approach to Lantau was also on behalf of Zang. [FN2]

The precise relationships among Zang, Hao and Wang are unclear, but it is clear that Wang intentionally withheld the information about the lock-up agreements from Lantau for the purpose of obtaining loan disbursements for OEI and Dongpo and a fee for himself. Wang is apparently a fugitive from China who was last known to be living somewhere in Florida.

In early May 2016, shortly after the April 2016 REX offering, defendant Wang approached Marino and advised Marino that Wang had clients who were interested in borrowing money against 917 million REX shares. The proximity in time between OEI and Dongpo's acquisition of REX shares and Wang's approach to Marino, certainly gives rise to an inference that Marino should have inquired whether the OEI and Dongpo shares had been acquired in the Haitong placement of restricted REX shares. Marino did not ask Wang whether Dongpo or OEI acquired their shares in the Haitong placement, and Marino never had any direct contact with [*5]either Dongpo or OEI. The only information Lantau requested Wang to provide with respect to Dongpo and OEI were passports of Dongpo and Weibin Huang, brokerage statements confirming that the prospective borrowers owned the shares, and utility bills. Marino also did not make any inquiry of Haitong as to whether Dongpo and OEI acquired their REX shares in the Haitong placement. Nevertheless, after receiving Wang's overture, Marino, sitting in his office in Westchester, reviewed the historical trading volume of unrestricted REX shares on the Hong Kong Exchange and proceeded to document the Dongpo and OEI stock loan transactions dealing exclusively with Wang.

Marino determined that the market value of unrestricted shares of REX trading on the Hong Kong financial exchange would make extending a repurchase loan to Wang's clients an attractive proposition at 50% of the value of the publicly traded shares. Marino ascertained that GPG would provide funding for the loan inasmuch as Lantau was not in a position to provide the necessary funding. GPG performed research on REX trading on the Hong Kong exchange similar to the analysis Marino performed and agreed to proceed with the transaction. Lantau's arrangement with GPG contemplated that GPG would purchase from Lantau each of the blocks of REX stock that Lantau expected to obtain from Dongpo and OEI. Consistent with their existing business model, Lantau and GPG agreed on terms whereby the purchase price for each block of stock would be made in at least two, and up to three, payments with the first two payments equal in amount to the amounts Lantau was obligated to disburse to the borrowers under the loan agreement.

On May 6, 2016, Lantau entered into separate loan agreements, springing pledge agreements, and related instruments (the "Loan Documents") with Dongpo and OEI. Dongpo and OEI agreed to pledge $500 million and 417 million shares of REX, respectively, as collateral. In each set of Loan Documents, the borrowers represented to Lantau that REX shares were "free and clear of any lien." In exchange, Lantau agreed to lend each borrower 50% of the fair market value of the pledged shares as measured by REX's VWAP on the Hong Kong Exchange for the eight-trading day period preceding loan funding. Lantau was to disburse the loans in two tranches with an initial disbursement of half the loan amount followed by the remainder eight business days later.

The Loan Documents required each borrower to open a new securities account with a broker designated by Lantau and arrange for delivery of all the shares into these new accounts before the closing of the loans. The Loan Documents provided that the borrowers would establish brokerage accounts at SVK, which would act as the custodial broker for the transactions. Lantau required the borrowers and the designated broker to enter into a Control Agreement which provided that upon closing Lantau would have complete control over the newly opened accounts and all securities in the account.

The scores of pages of single-spaced, English-language documents Lantau sent to Dongpo and his son Weibin Huang were not comprehensible to either Dongpo or Weibin Huang, but Dongpo and OEI executed the documents at the direction of Zang and/or Zang's associates Hao, Chen and Kennie Cheung, presumably because Zang would ultimately receive the lion's share of the loan proceeds.Each of Dongpo, Weibin Huang, Zang and Hao testified that they understood the REX stock was restricted and that they believed the stock loan was subject to the two-year lock-up restriction. While Dongpo and Weibin Wang had no idea what they were signing, the Court has no choice but to find that Dongpo and OEI knowingly executed all of the loan agreements and related documents submitted to them by Lantau and that they are bound by [*6]all their contractual undertakings.

As part of Marino's "diligence" for the contemplated transaction, Marino requested and reviewed the Haitong account statements of the prospective borrowers confirming that the borrowers owned the shares. The statements Marino received from Wang reflected that Dongpo and OEI had REX shares in accounts at Haitong and that zero REX shares in the Dongpo and OEI Haitong accounts were sellable. The statement also reflected that there was no last transferred price indicating that the shares were restricted. Marino, an extremely sophisticated lender, apparently did not understand the significance of the information on the Haitong account statements. But, SVK, as a registered Hong Kong broker, knew, or positively should have known from the Haitong account statements, that the REX shares were restricted.[FN3]

And SVK had "know your customer" duties with respect to onboarding as clients each of Dongpo, OEI, Lantau and GPG. SVK, as a party to the Control Agreements it executed was obligated to use reasonable efforts to notify Lantau "if any other person claims that . . . it is a violation of that person's rights for anyone else to hold, transfer, or deal with the [REX stock in SVK's custody]." As further particularized, SVK committed multiple breaches of fiduciary duty and undoubtedly violated many other obligations of a registered custodial broker.

On or about May 13, 2016, SVK opened Dongpo's account upon receiving Dongpo's account onboarding documents. However, on May 17, 2016, Lantau was informed that Haitong would not deliver the shares to Dongpo's account at SVK because Dongpo had a margin debt to Haitong in the approximate amount of $1.1 million. This should have been a further "red flag" to Marino. Nevertheless, after conferring with GPG, Marino and GPG determined that they could proceed with the transaction if the margin lien was satisfied by having the lien released in a delivery versus payment transaction ("DVP"). Bello, with GPG's knowledge, arranged to have the margin lien released by having Padia wire $1.6 million in two tranches from an account Padia controlled in the name of South Star Capital in exchange for 125 million REX shares that were delivered to Padia's account at Merrill Lynch. For the DVP transaction with Dongpo, Padia advanced $1.1 million for 90 million REX shares. Bellow insisted that Padia be protected in the DVP transactions by receiving stock valued at approximately double the amount of cash Padia sent to Haitong. The 90 million REX shares were delivered directly to Padia's account at Merrill Lynch. After the DVP transaction with Haitong with respect to Dongpo's REX shares was completed on May 19, SVK confirmed that it received delivery from Haitong of 410 million REX shares to Dongpo's account and SVK signed a Control Agreement with Dongpo and Lantau. The Control Agreement gave Lantau control over Dongpo's account and the REX shares in it. For the DVP transaction with OEI Padia advanced $500,000 on May 20 in exchange for 35 million REX shares. The balance of OEI's 372 million REX shares was similarly delivered to OEI's new account at SVK.

The Court finds that Padia, who was unknown to Marino and had no ownership interest in either Lantau or GPG, was a bona fide purchaser for value without notice of any restriction on the trading of the 125 million REX shares. Padia was involved in the DVP transactions by Bellow and neither Padia nor Bellow were affiliated with either Lantau or GPG. Marino may not even have known that Padia consummated the DVP transactions.

GPG and Lantau entered into two SPAs. In a May 16, 2016 SPA, GPG agreed to purchase 500 million REX shares corresponding to the number of shares pledged to Lantau by Dongpo. In a May 23, 2016 SPA, GPG agreed to buy 417 million REX shares corresponding to the number of shares pledged to Lantau by OEI. Other than the share amounts and the resulting purchase price, the May 16 and May 23 SPAs were substantively identical. The executed SPAs did not reflect the DVP transactions. The Lantau SPA with GPG required Lantau to deliver unrestricted, fully-tradable shares. Section 6 of the SPAs contained Representations Warranties and Covenants by Lantau that (1) "The [REX] shares held by [Lantau] without restriction on their sale or other disposition"; (2) "The [REX] shares are free and clear of any liens, charges or encumbrances"; (3) "There are no restrictions upon and conditions to the transfer of the [REX] shares in order to consummate the sale of the shares to [GPG] as contemplated by this Agreement[], and such shares are not, as of the date of this Agreement, and, as of the transfer date of such shares, will not be, subject to any restriction on transfer."

Lantau also agreed to indemnify GPG. Section 7.B of the SPAs provided that "[Lantau] hereby indemnifies and holds harmless [GPG] and any brokerage and/or clearing firm and attorney working with [GPG] against any claims with respect to the [REX] Shares . . . ." Finally, the Lantau SPA with GPG conditioned GPG's obligation to pay the purchase price for the shares "[U]pon confirmation of Final Acceptance of the Shares," and defined "Final Acceptance" as SVK's confirmation to GPG that, among other things, the shares "reside [in GPG's account at SVK] without restrictions." As the First Department explicitly recognized, GPG never entered into any written, signed waiver of any of its rights under the SPAs as would be required by the SPAs. The evidence adduced at trial established that although GPG required the initial payment to be made on the May 16 SPA, the "Final Acceptance" condition was never satisfied by SVK. And, manifestly, GPG would not have entered into the SPAs without Lantau's representations and warranties in Section 6 because GPG's entire modus operandi depended on its ability to recoup capital and make a profit by selling the shares.

After the Dongpo DVP transaction cleared and Haitong delivered Dongpo's restricted REX shares to Dongpo's account at SVK, Lantau issued instructions to SVK on May 19, 2016, to transfer shares from Dongpo's account to Lantau's account and then from Lantau's account to GPG's account. On Thursday, May 19, 2016, Lantau requested that GPG advance the funds for Lantau's initial loan disbursement to Dongpo
charges which GPG would not have incurred if Lantau had delivered unrestricted shares. In 2016 and 2017, SVK deducted a total of US $241,602 from GPG's account as reimbursement for legal fees. In addition to the US $241,602 that SVK deducted from GPG's account, SVK has claimed the right to assess from GPG an additional US $569,270 for SVK's legal fees in this lawsuit and US $398,333 for its legal fees in Hong Kong. It is undisputed that SVK has charged GPG or claimed the right to assess GPG a total of US $1,209,205 in legal fees.

In addition, GPG is entitled to recover the $78,000 plus interest on a promissory note Lantau executed in favor of GPG on behalf of Marino, Lantau Holdings and Lantau LLC in connection with the Hong Kong legal proceedings.

GPG claims that it repaid Padia for the DVP transactions and the first payment to Lantau under the GPG SPA. No credible evidence to support this contention was submitted during the Lantau v. GPG trial. Bello, who introduced Padia to GPG as a liquidity provider for the REX transaction, initiated a lawsuit against GPG that related at least in part to these transactions. It therefore would be inappropriate to hold Lantau liable to GPG for the portion of the first SPA payment that went from Padia to Lantau that Lantau paid to Wang. Therefore, the 125 million shares of REX cannot be recovered from Mr. Padia by either Lantau or GPG. Mr. Padia paid for and received 125 million REX shares.

As previously indicated and noted by the First Department, Dongpo and OEI clearly breached their SPAs with Lantau triggering both a default that entitled Lantau to recover the available REX shares in GPG's custodial account as well as Lantau's indemnification rights. Lantau's claim to recover interest and expected profit fails because Lantau did not fund Dongpo and OEI and both the anticipated loan interest and lost profits are too speculative to assess damages against Dongpo and OEI. In the latter connection, the Court rejects the expert testimony sponsored by Lantau's expert, Hinton.

The Court similarly rejects so much of GPG's counterclaim that seeks lost profits as that claim is also too speculative to quantify.

Lantau is not entitled to recover against Dongpo and OEI, under the indemnification, any legal fees expended by Lantau because the indemnification agreement contained in Section 10.4 of the Loan Agreement expressly relieves the indemnitors from damages that arise from the gross negligence of Lantau. The Court expressly finds that Marino and Lantau were grossly negligent in documenting and executing these transactions.

Dongpo and OEI's counterclaim against Lantau for fraud is without merit for all the reasons stated herein and is dismissed.

Finally, the default judgment which Lantau is entitled to enter against defendant Wang includes all out-of-pocket losses and indemnified expenses incurred by Lantau which will be catalogued in the default judgment Lantau shall submit. Similarly, GPG shall submit a judgment against the Lantau parties consistent with this decision.

DATED February 11, 2019

____________________________________

Barry R. Ostrager, JSC

Footnotes

Footnote 1: Lantau also asserted a breach of contract claim against GPG in connection with the Rongsheng stock purchase agreement between Lantau and GPG. Lantau failed to prove by a preponderance of the evidence that Lantau is entitled to recover the $134,278.35 at issue on this claim because GPG successfully established that due to a volume weighted average price ("VWAP") miscalculation, GPG actually paid Lantau more than it was entitled to receive in connection with this disputed transaction. The evidence also established that Marino assented to the final distribution of profits from the Rongsheng transaction.

Footnote 2: Zang ultimately entered into a share loan transaction with another party.

Footnote 3: The Court credits Wong's testimony that Lantau did not share copies of the Haitong account statements with GPG; Marino gave contrary testimony which the Court does not credit.

Footnote 4: Lantau treated these DVP payments as disbursements to the Borrowers under the Loan Documents and deducted the shares sold in the DVP transactions from the amounts to be sold under the SPAs.

Footnote 5: Section 8.2 of the Loan Agreements provides:

<para level="1">8.2 Rights Upon an Event of Default. . . . Upon the occurrence of an Event of Default, Lender shall thereupon have the rights, benefits, and remedies afforded to it under any of the Loan Documents with respect to the Collateral and may take, use, or otherwise encumber or dispose of the Collateral as if it were the Lender's own property. . .

<para level="2">Section 9.2 of the Loan Agreements provides:

<para level="2">In the event of Borrower fails to fully and timely repay the Obligations, or an Event of Default has occurred and is continuing under the Loan Documents, Lender [i.e. Lantau] shall be entitled to exercise its rights as otherwise set forth in this Loan Agreement in addition to Lender being entitled to retain as its sole property and/or dispose of the Collateral . . . free and clear of any encumbrances or any claims by Borrower . . .

<para level="2">

Footnote 6: To support Lantau's contention that GPG affirmed the SPA, Lantau points to a May 26 e-mail from Howard Blum which stated in words or substance that Dongpo and OEI are in default, but we still make money, presuming that GPG would continue trading the shares. But both parties agreed to terminate the SPAs and it was only long after the fact that Lantau asserted otherwise.

Footnote 7: Because SVK was unable to deliver shares, SVK conducted a "buy-in" whereby 34.25 million replacement shares of REX were purchased at GPG's expense and delivered to settle GPG's trades. GPG incurred a buy-in charge of $1,379,756.

<form method="LINK" action="../../slipidx/com_div_idxtable.shtml">

<input type="submit" value="Return to Decision List">

</form>

</para></para></para></para></partyblock>